UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**United States of America**

    **v.**                                                      Criminal No. 3:08-cr-36-PJB

**Anibal Acevedo Vila, et al.**

**MEMORANDUM AND ORDER**

    Anibal Acevedo Vila, Candido Negron Mella, Salvatore Avanzato, Jorge Velasco Mella, Robert M. Feldman, Marvin I. Block, Ramon Velasco Escardille, Edwin Colon Rodriguez, Eneidy Coreano Salgado, Luisa Inclan Bird, Miguel Nazario Franco, Ricardo Colon Padilla, and Jose Gonzales Freyre have been named as defendants in a twenty-seven count indictment.  All of the charged crimes concern either Acevedo Vila's 2000 and 2002 campaigns for Resident Commissioner or his 2004 gubernatorial campaign.

    The charges fall into three categories.  Counts 1-9 stem from an alleged conspiracy to make, receive, and conceal illegal contributions to Acevedo Vila's Resident Commissioner campaigns. Counts 10-24 result from an alleged scheme to illegally obtain approximately $7 million in public financing for Acevedo Vila's

2004 gubernatorial campaign.  Counts 25-27 are based on an alleged conspiracy to prevent the Internal Revenue Service ("IRS") from ascertaining and collecting taxes that Acevedo Vila owed in 2003 and 2004 on certain taxable benefits that he allegedly received from his campaign committee and political supporters.

Acevedo Vila has moved to dismiss many of the counts against him and other defendants have either joined in his motion or have filed their own motions raising similar arguments.  I address defendants' motions collectively and analyze the challenges they present to each category of charges in turn.

## I.   COUNTS 1-9

### A.   BACKGROUND

Acevedo Vila and nine other defendants are charged in Count 1 with participating in a conspiracy to make, receive, and conceal illegal campaign contributions to Acevedo Vila's 2000 and 2002 campaigns for Resident Commissioner.  Counts 2-9 charge several of the defendants named in Count 1 with making false statements to the Federal Election Commission ("FEC") and the Federal Bureau of Investigation ("FBI") in an effort to further the conspiracy and conceal its existence.

-2-

The conspiracy was allegedly carried out in three phases. The first phase (the "Collaborator Contribution Scheme") took place between September 1999 and May 2000.  During this period, Acevedo Vila, Velasco Escardille, Colon Rodriguez, and other unnamed conspirators allegedly recruited contributors to pay off Acevedo Vila's campaign debt to an unnamed corporation.  The defendants implemented this scheme by causing Acevedo Vila's supporters to make contributions directly to the corporation without recording the contributions in the books and records of Acevedo Vila's campaign committee.  The campaign committee also failed to report the contributions to the FEC as the law required.  To further conceal the contributions, false invoices were prepared to make it appear as if the contributions were payments for services rendered by the corporation to the contributors.  More than $180,000 in illegal campaign contributions allegedly were received by Acevedo Vila's campaign committee in connection with the Collaborator Contribution Scheme.  (See Indictment, Doc. No. 9, at 8-9, 13-16.)

The second phase of the conspiracy (the "Family and Staff Conduit Contribution Scheme") occurred between September 2001 and December 2002.  Acevedo Vila and Inclan Bird allegedly solicited members of Acevedo Vila's family, as well as staff members at the

Resident Commissioner's office, to serve as conduits for illegal campaign contributions.  The conduits made contributions to Acevedo Vila's campaign committee, and Acevedo Vila and Inclan Bird reimbursed the conduits for their contributions with cash or checks.  The campaign committee concealed the true nature of the conduit contributions by filing false contribution reports with the FEC.  More than $10,000 in conduit contributions allegedly were received by Acevedo Vila's campaign committee in connection with the Family and Staff Conduit Contribution Scheme.  (Id. at 9, 16-18.)

The third phase of the conspiracy (the "Philadelphia Conduit Contribution Scheme") took place between February 2002 and June 2003.  Acevedo Vila, Feldman, Negron Mella, Avanzato, Velasco Mella, and Coreano Salgado allegedly worked together to obtain and conceal the true nature of conduit contributions ostensibly made by a group of contributors in the Philadelphia, Pennsylvania area.  More than $130,000 in conduit contributions allegedly were received by Acevedo Vila's campaign committee during this phase of the conspiracy.  (Id. at 10-13, 18-26.)

## B.   **DUPLICITY**

Defendants first contend that the conspiracy count must be dismissed because it is duplicitous.  As the U.S. Court of

-4-

Appeals for the First Circuit has explained, "[d]uplicity is the joining in a single count of two or more distinct and separate offenses." United States v. Verrecchia, 196 F.3d 294, 297 (1st Cir. 1999) (quoting United States v. Canas, 595 F.2d 73, 78 (1st Cir. 1979)).  Defendants argue that Count 1 is duplicitous because it improperly sweeps three distinct criminal schemes into a single conspiracy charge.[1]

Defendants develop their argument by carefully de-constructing the conspiracy count.  They note that each of the three phases of the conspiracy began and ended at different times.  They point to the fact that Acevedo Vila is the only defendant who allegedly participated in all three phases of the conspiracy.  They complain that the Collaborator Contribution Scheme differs from the other two schemes in the way in which the

---

[1]  A charge ordinarily should not be dismissed simply because it is duplicitous. 1A Charles Allen Wright et al., Federal Practice and Procedure § 145 (3d ed. 2008).  Instead, the government generally will be permitted to choose the single charge on which it intends to proceed.  Id.  In this case, however, both the Collaborator Contribution Scheme and the Family and Staff Conduit Contribution Scheme would be barred by the statute of limitations if I were to treat each phase of the charged conspiracy as a separate conspiracy.  Thus, if I were to determine that Count 1 is duplicitous, I would dismiss the Collaborator Contribution Scheme and the Family and Staff Conduit Contribution Scheme and instruct the government to proceed only on the Philadelphia Conduit Contribution Scheme.

illegal fundraising was concealed.  They argue that the
Philadelphia Conduit Contribution Scheme is distinct because it
was carried out on the mainland rather than in Puerto Rico.
Finally, they assert that each scheme had a different specific
objective and that the alleged conspirators lacked common
motivations.  For all of these reasons, defendants argue that
each phase of the conspiracy must be charged in a separate
conspiracy count. (See Def. Acevedo Vila's Mot. to Dismiss, Doc.
No. 182, at 5–16.)

I am unpersuaded by defendants' argument.  A single
conspiracy does not necessarily fracture into multiple
conspiracies simply because the conspiracy was carried out in
different phases.  United States v. Eppolito, 543 F.3d 25, 47–48
(2d Cir. 2008); United States v. Small, 423 F.3d 1164, 1184 (10th
Cir. 2005); United States v. Calderon, 127 F.3d 1314, 1329 (11th
Cir. 1997).  Nor are changes in membership dispositive.
Eppolito, 543 F.3d at 48; United States v. Segines, 17 F.3d 847,
856 (6th Cir. 1994).  A single conspiracy can also encompass
multiple criminal methods, United States v. Brandon, 117 F.3d
409, 451 (1st Cir. 1994), and it can be carried out at different
locations, United States v. Walker, 142 F.3d 103, 112 (2d Cir.

1998).  Finally, the individual motivations that lead participants to join a conspiracy may differ without precluding the existence of a single conspiracy.  Eppolito, 543 F.3d at 48. Although all of these factors may be considered at trial in determining whether a charged conspiracy is in fact a series of separate conspiracies, United States v. Trainor, 477 F.3d 24, 33 (1st Cir. 2007), none are necessarily decisive in determining whether a conspiracy count is duplicitous.  Instead, duplicity is assessed by identifying the "unit of prosecution" for the charged offense.  Verrecchia, 196 F.3d at 297; United States v. Haddy, 134 F.3d 542, 548 (3d Cir. 1998).

Identifying the appropriate unit of prosecution is a matter of statutory interpretation.  Sanabria v. United States, 437 U.S. 54, 69 (1978).  Because the U.S. Supreme Court has repeatedly recognized that "the essence of a conspiracy is an 'agreement to commit an unlawful act,'" United States v. Jimenez Recio, 537 U.S. 270, 274 (2003) (citations omitted), the unit of prosecution for the offense of conspiracy is the criminal agreement on which the conspiracy charge is based.  Braverman v. United States, 317 U.S. 49, 54 (1942).  Accordingly, defendants' duplicity challenge turns on whether the Indictment properly alleges that all of the

conspirators joined in a common agreement to achieve the conspiracy's unlawful objectives.

The conspiracy count charges that the conspirators joined in a common agreement to solicit, receive, and conceal illegal contributions for Acevedo Villa's campaigns for Resident Commissioner.  The alleged agreement spanned all three phases of the alleged conspiracy and encompassed all of the alleged conspirators.  No more than this is required for the conspiracy count to survive defendants' duplicity challenge.  Whether the evidence at trial will support the government's contention is a matter that will have to be resolved at a later stage of the proceedings.[2]

**C.   <u>VAGUENESS</u>**

Inclan Bird argues that Count 1 is too vague and "falls far short of describing in any coherent way how Defendant Inclan Bird's conduct violates the law."  (Def. Inclan Bird's Mot. to Dismiss, Doc. No. 169, at 4.)  Inclan Bird is mentioned only

---

[2]   Feldman has moved to dismiss Count 1 for lack of venue. As he acknowledges, however, his motion is based on the assumption that Count 1 is duplicitous. (Def. Feldman's Mot. to Dismiss, Doc. No. 177, at 2.)  Because I reject defendants' duplicity challenge, I also deny Feldman's motion to dismiss for lack of venue.

-8-

twice in the overt acts comprising Count 1, namely, the allegation that in 2001 she solicited, and then later reimbursed, conduit contributions.

An indictment must present a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  The goal is to provide enough information to make the defendant aware of the charges against which she must defend and allow her to "plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974); see United States v. Resendiz-Ponce, 549 U.S. 102, 108 (2007).  "The allegations of an indictment are presumed to be true for the purposes of assessing whether an indictment is sufficient to withstand a motion to dismiss, and inquiry into whether the government can prove its case at trial is inappropriate at this stage." United States v. Dunbar, 367 F. Supp. 2d 59, 60 (D. Mass. 2005).

Count 1 tracks the language of 18 U.S.C. § 371.  As required, it alerts the defendants to the charge against them, the time period of the unlawful alleged activity, those claimed to be involved, and the specific conduct at issue.  See United

States v. Olderbak, 961 F.2d 756, 760 (8th Cir. 1992)
(requirements of 7(c)(1) met because indictment "sufficiently
apprised the defendants of the time frame of the alleged drug
activity, the members of the alleged conspiracy, and the type of
drugs involved"); United States v. Ramos, 666 F.2d 469, 474 (11th
Cir. 1982) (an indictment that tracks the statute's language,
"supplemented by precise allegations of the time and place of the
criminal activity" and "the names of the participants and the
controlled substance involved," is sufficient).  It also alleges
that the defendants agreed to illegally raise money to support
Acevedo Vila's political ambitions and to take steps to conceal
the true nature of their plot.  Specific overt acts are alleged,
and while only a few of them name Inclan Bird in particular, she
nonetheless is identified as a central player in the alleged
conspiracy.  In short, the allegations are sufficiently detailed
to withstand defendants' vagueness challenge.


## II.  <u>COUNTS 10-24</u>

**A.  <u>BACKGROUND</u>**

Counts 10-24 stem from an alleged scheme to obtain
approximately $7 million in public financing for Acevedo Vila's

2004 gubernatorial campaign without complying with the spending cap that Puerto Rico's electoral law imposes on recipients of public financing.  Counts 10-21 charge Acevedo Vila, Velasco Escardille, Inclan Bird, Nazario Franco, Colon Padilla, and Gonzalez Freyre with wire fraud.  Count 22 charges all of the wire fraud defendants except Velasco Escardille and Gonzalez Freyre with program fraud.  Counts 23 and 24 charge Gonzalez Freyre and Colon Padilla with making false statements to agents of the FBI and the IRS in an effort to conceal illegal campaign contributions to Acevedo Vila's gubernatorial campaign.  (See Indictment, Doc. No. 9, at 34-48.)

Defendants attack the legal theory that underlies the wire fraud and program fraud counts.  Because their argument is based on Puerto Rico's electoral law, I first provide an overview of that law and then turn to the merits of defendants' argument.

**B.    THE ELECTORAL LAW**

Puerto Rico's electoral law establishes two sources of public funding that candidates for governor may draw on to subsidize their election campaigns.

The "Electoral Fund" is available to all qualifying political parties and their gubernatorial candidates.  P.R. Laws

Ann. tit. 16, § 3116 (2007).  In non-election years, each party
and its candidate may draw up to $300,000 from the Electoral
Fund.  Id.  The amount increases to $600,000 in election years.
Id.  Monies obtained from the Electoral Fund must be used
exclusively to defray "administrative campaign expenses and
political propaganda in Puerto Rico."  § 3118.  Candidates and
political parties that draw on the Electoral Fund must report all
expenses chargeable to the Fund every three months.  § 3109.  The
Secretary of the Treasury is barred from making disbursements
from the Electoral Fund to a participating candidate until the
candidate complies with the law's reporting requirements.  Id.

     Gubernatorial candidates and their political parties may
also participate in the "Voluntary Fund."  To enroll, a candidate
must agree to abide by the terms of the program and file a
certification to that effect with the Secretary of the Treasury.
§ 3117.  If the required certification is filed, participation in
the Voluntary Fund is "final and binding and may not be revoked
for that specific general election."  Id.  The Voluntary Fund is
maintained by the Treasury Department, which is responsible for
the custody, management, and disbursement of the resources
therein.  The Voluntary Fund is "nurtured by private and public

resources," meaning that it is financed both with public funds
and private contributions raised by the political parties and
gubernatorial candidates.  Id.  Interest that accrues on money
deposited in the Voluntary Fund, money recovered through civil
penalties resulting from violations of the Voluntary Fund's
terms, and money left unused by former candidates who previously
partipated in the public financing system are some of the other
sources of revenue for the Voluntary Fund.  § 3117(b).

     Once a candidate agrees to participate in the Voluntary
Fund by filing the required certification, the Secretary of the
Treasury deposits $3 million into a Voluntary Fund account for
that candidate.  § 3117(c)(1).  The candidate (and the political
party with which he is affiliated) can then raise up to an
additional $4 million in private contributions, which must also
be deposited into the candidate's account.  § 3117(c)(2).  The
Treasury Department will match any private contributions up to $4
million. § 3117(c)(3).  Money deposited into the Voluntary Fund
must be used "exclusively to defray the campaign expenses of the
political party and its campaign for governor."  § 3117(e).

     Section 3117a of the electoral law imposes a spending cap of
$11 million on gubernatorial candidates who participate in the

-13-

Voluntary Fund.  It also provides that "[a]ny political party, candidate for governor and any candidate for mayor that exceeds the limits provided in this section shall be subject to a civil penalty and the procedures provided in § 3109 of this title."

Section 3109 states in pertinent part that "[a]ny party entitled to the Electoral Fund, which exceeds the limits established in this subtitle or its Regulations for its campaign expenses, shall be subject to the payment of a penalty equal to two (2) times the sum in excess of the limits provided in this subtitle."  It also authorizes the Electoral Commission to go to court to recover the penalty and to stop continued violations of the electoral law.

Section 3354 makes it a crime for a person to  "knowingly and fraudulently" violate the electoral law.  Section 3366 specifically addresses spending violations by making it unlawful for any person to "pay or incur in campaign information media expenses . . . in excess of the limits established in this subtitle."

C.   **ANALYSIS**

The wire fraud and program fraud counts allege that defendants enabled Acevedo Vila to draw on his Voluntary Fund

account by fraudulently concealing the fact that his campaign had exceeded Puerto Rico's public financing spending cap.[3]  As the government acknowledges, the charges thus depend upon the premise that Puerto Rico's electoral law bars a candidate from drawing on his Voluntary Fund account if his campaign has exceeded the spending cap.  See Transcript of Oral Argument at 94-97, United States v. Acevedo Vila, No. 08-cr-036 (Sept. 23, 2008).

Defendants attack the premise on which the wire fraud and program fraud charges are based by contending that the electoral law subjects a candidate who exceeds the spending cap to a civil penalty and the possibility of criminal prosecution but does not bar the candidate from drawing on his Voluntary Fund account. Thus, they argue that the charges at worst allege a scheme to violate local law rather than a scheme to deprive Puerto Rico of

---

[3]  The wire fraud counts allege that "[t]he object of the scheme and artifice to defraud, was for defendant ACEVEDO VILA and Comité Anibal to obtain public campaign financing from the Puerto Rico Treasury Department in the approximate amount of $7,000,000 by circumventing certain legal requirements required by the Commonwealth of Puerto Rico's public campaign financing laws." (Indictment, Doc. No. 9, at 38-39.)  The counts then go on to identify the spending cap as the legal requirement that defendants schemed to circumvent.  Although the program fraud count does not specify the fraud scheme that defendants allegedly used to obtain access to public financing, the government concedes that it too is based on the fraudulent concealment of excessive campaign spending.

"property."  Such schemes cannot be the basis of either wire fraud or program fraud charges, they argue, because both crimes require proof that the object of the alleged fraud was "property" in the hands of the victim.[4]

The government responds to the defendants' argument solely by challenging their interpretation of the electoral law.  In the government's view, that law plainly bars a candidate from drawing on the Voluntary Fund after his campaign has exceeded the spending cap.  Thus, the charged scheme to conceal excessive campaign spending is prosecutable as wire fraud and program fraud, the government argues, because it is a scheme to obtain access to the Voluntary Fund rather than a scheme merely to conceal violations of Puerto Rican law.  The government presents three arguments in support of its position and I examine each argument in turn.

---

[4]  The U.S. Supreme Court has construed the mail and wire fraud statutes to require that the object of the charged fraud scheme must be property in the hands of the victim.  See Pasquantino v. United States, 544 U.S. 349, 355 & n.2 (2005) (wire fraud); Cleveland v. United States, 531 U.S. 12, 26-27 (2000) (mail fraud).  The type of program fraud at issue here explicitly requires proof that "property" was "obtain[ed] by fraud."  18 U.S.C. § 666(a)(1)(A).  Thus, neither statute can be used to prosecute a scheme to conceal violations of local law unless the scheme is also designed to deprive a victim of property.

The government first argues that a candidate is barred from drawing additional money from the Voluntary Fund after he has exceeded the spending cap because the electoral law prohibits the Secretary of the Treasury from making further disbursements to such candidates.  The government bases its argument on sections 3117a and 3109 of the electoral law.  Section 3117a establishes the spending cap and provides that candidates who exceed the cap "shall be subject to a civil penalty and the procedures provided in § 3109 of this title."  Section 3109 does four things:  it requires candidates who participate in the Electoral Fund to report expenditures chargeable to the Fund; it states that "[t]he Secretary of the Treasury shall not authorize any disbursement whatsoever chargeable to the Electoral Fund, for any party or candidate until the provisions of this section are complied with"; it establishes the penalty for excessive campaign spending; and it empowers the Electoral Commission to go to court to recover the penalty and to "stop the continued violation of this subtitle."  The government focuses on the second of these four provisions in arguing that the Secretary's duty to withhold disbursements in section 3109 is one of the "procedures" that candidates who exceed the spending cap are subject to pursuant to

section 3117a.

The central difficulty with the government's argument is
that it is inconsistent with the statutory text on which it
depends.  For the government's argument to succeed, the Secretary
of the Treasury's duty in section 3109 to withhold disbursements
would apply to disbursements from the Voluntary Fund even though
that duty expressly encompasses only disbursements from the
Electoral Fund, it would be triggered by excessive campaign
spending even though section 3109 specifies that the Secretary
may only withhold disbursements from candidates who fail to
comply with the section's reporting requirements, and it would
result in a permanent ban on disbursements from the Voluntary
Fund after the spending cap has been exceeded even though section
3109 specifies that disbursements are to be withheld only until
the candidate complies with the section's requirements.  Such a
strained reading of section 3109 cannot be justified simply
because section 3117a subjects candidates who exceed the spending
cap to the "procedures" set forth in section 3109.  Instead, as
defendants more sensibly contend, the reference to "procedures"
in section 3117a includes only the power that section 3109 gives
to the Electoral Commission to go to court to recover the penalty

for excessive spending and to halt further violations of the electoral law.

The administrative regulations that implement sections 3109 and 3117a support this reading of the electoral law.  Part XVI of the Treasury Department Rules and Regulations No. 48 provides at paragraph 8:

> Each political party . . . will maintain a complete and detailed accounting of any expense incurred by them and charged to the Electoral Fund or the Voluntary Fund. Every three (3) months within the first ten (10) days following the end of the report period, they must also submit to the Commission and the Secretary a report, duly sworn, certifying these expenses, including the date of the expense, the name of the person in whose favor payment was ordered and their complete address, as well as the reason for incurring in this expense. *The Secretary will not authorize any disbursement from the Electoral Fund or the Voluntary Fund to any party or independent candidate, until the obligation of submitting the reports is complied with.*

(Treasury Rules and Regulations No. 48, Doc. No. 352-17, at 57.)

Paragraph 9 of the regulations provides in pertinent part that:

> [A]ny political party that avails itself of the Electoral Fund and/or the Voluntary Fund and whose campaign expenses are in excess of the limits established in the Law or its rules and regulations, will be subject to a penalty payment equal to twice (2 times) the amount of the excess expenditures . . . [and the] Commission will go to the appropriate Court of Justice with the suitable resource to impede the continued violation . . . .

(Id. at 52.)  When these two paragraphs are construed together,

they support the view that the Secretary of the Treasury's power to withhold disbursements is limited to situations in which a candidate or party has failed to comply with its reporting obligations, whereas the power to enforce the spending cap is given exclusively to the Electoral Commission.  Accordingly, I am unpersuaded by the government's contention that section 3109 gives the Secretary of the Treasury the power to withhold disbursements from candidates who have exceeded the spending cap.

The government next argues that candidates lose the right to draw on the Voluntary Fund after they exceed the spending cap because the Electoral Commission's power in section 3109 to go to court to stop continued violations of the electoral law necessarily includes the power to stop a candidate who has exceeded the spending cap from drawing on the Voluntary Fund. This argument is plainly without merit.

A candidate who elects to participate in the Voluntary Fund violates the spending cap by spending more than $11 million on his campaign.  See § 3117a.  A request for reimbursement from the Voluntary Fund is not an expenditure, and thus, it does not violate the spending cap.  Nor does any other provision of the electoral law make it unlawful for a candidate who has exceeded

the spending cap to seek reimbursement from the Voluntary Fund.
Accordingly, the Electoral Commission's power to go to court to
stop continued violations of the electoral law does not include
the power to stop a candidate who has exceeded the spending cap
from drawing on the Voluntary Fund.

The government's third argument is that its interpretation
of the electoral law must be adopted because it would be absurd
to construe the law to permit a candidate to continue to benefit
from the Voluntary Fund after he has exceeded the spending cap.
I am also unpersuaded by this argument.

The Puerto Rican legislature has chosen to enforce the
spending cap by subjecting violators to a civil penalty and the
possibility of criminal prosecution.  Under the government's
interpretation of the electoral law, a candidate who exceeds the
spending cap by even a small amount would also be completely
barred from drawing on the Voluntary Fund even to obtain
reimbursement for expenses that were incurred before the spending
cap was exceeded.  This could result in the complete loss of up
to $7 million in public funding as well as the forfeiture of up
to $4 million in contributions raised from private sources.
Clearly, the legislature reasonably could have concluded that it

did not need to subject candidates to such potentially harsh
consequences in order to deter spending cap violations given the
alternative enforcement mechanisms that are expressly included in
the electoral law.  Thus, I do not agree that the electoral law
would be absurd unless I adopted the government's proposed
interpretation of the law.

In summary, I am unpersuaded by the government's argument
that a candidate who exceeds the spending cap is thereafter
barred from drawing on the Voluntary Fund.  Instead, I agree with
the defendants that the electoral law allows a candidate to draw
on the Voluntary Fund even if he has exceeded the spending cap.
Accordingly, a scheme to conceal campaign spending in violation
of the spending cap is a scheme to violate Puerto Rican law
rather than a scheme to defraud Puerto Rico of its contributions
to the Voluntary Fund.  Because such a scheme cannot serve as the
basis for wire fraud or program fraud prosecution, the charges
are defective and must be dismissed.[5]

---

[5]  Gonzales Freyre is charged in Count 23 with making a
false statement to agents of the FBI and the IRS concerning a
disguised political contribution to Acevedo Vila's gubernatorial
campaign.  He argues that the alleged false statement cannot be
material as a matter of law because it concerned only a potential
violation of local election law that neither the FBI nor the IRS
have jurisdiction to investigate.  I disagree.  Materiality
presents a mixed question of law and fact that ordinarily must be

### III.   COUNTS 25-27

**A.   BACKGROUND**

Acevedo Vila and Inclan Bird are charged in Count 25 with
conspiracy to prevent the IRS from correctly ascertaining and
collecting income taxes that Acevedo Vila owed to the federal
government on certain taxable benefits that he allegedly received
from his campaign committee and political supporters.  Counts 26
and 27 charge Acevedo Vila with filing false federal income tax
returns.  (See Indictment, Doc. No. 9, at 49-55.)

Acevedo Vila and Inclan Bird have moved to dismiss the
conspiracy count because they claim that it fails to properly
allege a conspiracy to defraud.  Acevedo Vila also challenges the
false tax return counts because he claims that the charges are
based on a legal theory that the government concedes it has no
evidence to support.  I address each argument in turn.

**B.   CONSPIRACY COUNT**

A conspiracy to defraud the United States by frustrating the

---

resolved by a jury.  United States v. Gaudin, 515 U.S. 506, 522-
23 (1995).  I cannot conclude as a matter of law that both the
FBI and the IRS lacked jurisdiction to question Gonzales Freyre
concerning disguised political contributions to Acevedo Vila's
gubernatorial campaign.  Accordingly, defendant's motion to
dismiss Count 23 (Doc. No. 190) is denied.

functions of the IRS is known as a <u>Klein</u> conspiracy.  <u>See</u> <u>generally</u> <u>United States v. Klein</u>, 247 F.2d 908 (2d Cir. 1957).  A <u>Klein</u> conspiracy consists of three elements that must be alleged in an indictment: (1) an agreement between two or more people to accomplish an unlawful objective against the United States; (2) the commission of an overt act in furtherance of the conspiracy; and (3) the knowing and voluntary participation of the defendants in the conspiracy.  <u>See</u> <u>Brandon</u>, 17 F.3d at 428.  "Such conspiracies to defraud are not limited to those aiming to deprive the government of money or property, but include conspiracy to interfere with government functions."  <u>United States v. Goldberg</u>, 105 F.3d 770, 773 (1st Cir. 1997).  In addition, the means used to achieve the unlawful goal of the conspiracy need not be unlawful and the government need not demonstrate that taxes have not been paid.  <u>See</u> <u>United States v. Tarvers</u>, 833 F.2d 1068, 1075 (1st Cir. 1987).

Acevedo Vila and Inclan Bird have filed overlapping motions to dismiss Count 25 on the grounds that a <u>Klein</u> conspiracy has not been sufficiently alleged.  Defendants argue that the conspiracy count fails to properly allege the following: (1) an agreement; (2) an unlawful purpose to defraud; and (3) defrauding

-24-

or interfering with the IRS.  I will consider each of these
arguments in turn.  (Def. Acevedo Vila's Mot. to Dismiss, Doc.
No. 182-2, at 45-50.)

    **1.**  **<u>Agreement</u>**

Acevedo Vila and Inclan Bird argue that Count 25 fails to
properly allege that they agreed to obstruct the IRS's functions.
They argue that Count 25 makes boilerplate allegations tracking
the language of section 371, but does not provide any factual
allegation that they agreed to engage in unlawful activity for
the purpose of concealing income.  The defendants assert that
Count 25 merely alleges a failure to disclose income and does not
allege an agreement to interfere with government functions, as is
required to establish a <u>Klein</u> conspiracy.  <u>See</u> <u>United States v.
Adkinson</u>, 158 F.3d 1147, 1154 (11th Cir. 1998).  However, Count
25 explicitly alleges that Acevedo Vila and Inclan Bird "did
knowingly, willfully, and unlawfully, combine, conspire,
confederate, and agree to defraud the United States."
(Indictment, Doc. No. 9, at 50.)  Such allegations ordinarily are
sufficient to support this element of a conspiracy charge.
<u>Hamling</u>, 418 U.S. at 117.

Acevedo Vila also argues that the only factual allegation of an agreement is that in 2006 Inclan Bird and "others" agreed to falsely claim clothing purchases for him as business expenses of the Popular Democratic Party and post-date those expenses to include them in reports to the State Electoral Commission in 2005. (Indictment, Doc. No. 9, at 53.) He asserts that this alleged agreement occurred after the relevant time period, does not suggest his participation, and does not pertain to his taxes. Although Acevedo Vila is correct that the overt acts alleged in Count 25 include an agreement between Inclan Bird and others, and that proof of this agreement alone would likely be insufficient to meet the requirements of a <u>Klein</u> conspiracy, the existence of that agreement does not suggest that an agreement between Acevedo Vila and Inclan Bird did not exist. The count does not specifically allege when or how a meeting of the minds occurred between Acevedo Vila and Inclan Bird, but it does allege sufficient facts to allow the inference of an agreement by a jury. The conspiracy count thus sufficiently alleges the first element of a <u>Klein</u> conspiracy.

## 2. <u>Unlawful Purpose to Defraud</u>

The defendants also argue that Count 25 fails to allege a

-26-

<u>Klein</u> conspiracy because even if an agreement is alleged, there
is no allegation that the agreement's objective was to interfere
with the lawful functions of the IRS.  The objective of an
agreement is unlawful if it is "for the purpose of impairing,
obstructing, or defeating the lawful function of any department
of government." <u>Dennis v. United States</u>, 384 U.S. 855, 860-61
(1966) (citations omitted).  Interference with government
functions cannot be a mere foreseeable consequence or collateral
effect of another agreement if a <u>Klein</u> conspiracy is to be
charged. <u>Goldberg</u>, 105 F.3d at 774; <u>United States v.</u>
<u>Pappathanasi</u>, 383 F. Supp. 2d 289, 291-92 (D. Mass. 2005).  In
such a conspiracy, "the fraud has to be a *purpose or object* of
the conspiracy, and not merely a foreseeable consequence of the
conspiratorial scheme." <u>Goldberg</u>, 105 F.3d at 773.  The
government must prove co-conspirators agreed to defraud the IRS,
and not merely that "a defendant agreed to pay someone under the
table knowing that he had no intention of reporting the money to
the IRS." <u>Pappathanasi</u>, 383 F. Supp. 2d at 291-92 (quoting
<u>Goldberg</u>, 105 F.3d at 774).

Acevedo Vila argues that Count 25 merely makes a boilerplate
allegation that tracks the language of the statute and fails to

provide any factual allegation that he did anything other than
fail to disclose income.  However, Count 25 specifically alleges
that Inclan Bird and Acevedo Vila "did knowingly, willfully, and
unlawfully, combine, conspire, confederate, and agree to defraud
the United States Treasury Department and the Internal Revenue
Service . . . ."  (Indictment, Doc. No. 9, at 50.)  This language
is sufficient to allege intent by the defendants to agree to the
conspiracy and to defraud the United States.  See United States
v. Ervasti, 201 F.3d 1029, 1037-38 (8th Cir. 2000) (upholding as
sufficient Klein conspiracy indictment with similar language).

     Inclan Bird argues that Count 25 does not demonstrate that
she intended to agree to defraud the IRS, because it describes
the object of the conspiracy as concealment and there is no nexus
between her alleged overt acts and the filing of the tax returns
in issue.  (Def. Inclan Bird's  Mot. to Dismiss, Doc. No. 171, at
1-2.)  However, "a conspiracy may have multiple objectives, and
'if one of its objectives, even a minor one, be the evasion of
federal taxes, the offense is made out, though the primary
objective may be concealment of another crime.'"  Adkinson, 158
F.3d at 1155 (quoting Ingram v. United States, 360 U.S. 672, 679-
80 (1959)).  Although Count 25 states that an object of the

conspiracy was "to conceal the fact that ACEVEDO VILA's personal income was being supplemented with funds derived from political activity," (Indictment, Doc. No. 9, at 50), this does not preclude the possibility that Acevedo Vila and Inclan Bird also intended to impede the IRS, see Adkinson, 158 F.3d at 1155; Goldberg, 105 F.3d at 773-74.  No case law prohibits the government from proving multiple objectives in the conspiracy. And, as noted in the preceding paragraph, Count 25 explicitly states that the agreement between Acevedo Vila and Inclan Bird was to defraud the IRS.

### 3.  **Defrauding the IRS**

Acevedo Vila argues that Count 25 "does not adequately allege a scheme that could even theoretically have had the purpose to defraud the IRS, because . . . no *federally* reportable income was missing from Mr. Acevedo Vila's tax returns."  (Def. Acevedo Vila Mot. to Dismiss, Doc. No. 182-2, at 50.)  I disagree.

Count 25 alleges that Acevedo Vila "signed and filed false individual income tax returns" for 2003 and 2004.  (Indictment, Doc. No. 9, at 53.)  The government contends that it will prove at trial that federally reportable income was missing from

Acevedo Vila's returns.  Whether the government will be able to produce sufficient evidence to support this contention is a matter that will have to be resolved at trial.

## C.   **FALSE TAX RETURN COUNTS**

Counts 26 and 27 allege that Acevedo Vila's tax returns were false because he understated his total gross income on line 22 of his federal income tax returns.[6]  Acevedo Vila attacks both counts because he claims that the government admits that his entries on line 22 correctly reported his total gross income.

The government concedes that it will not argue at trial that Acevedo Vila understated his income on line 22 of his federal returns.  See Transcript of Telephone Conference, United States v. Acevedo Vila, No. 08-cr-036 (Oct. 22, 2008).  This is because the income that it claims Acevedo Vila failed to report was Puerto Rican-sourced income, which he was not required to include on line 22.  See generally, 26 U.S.C. § 933.  Instead, the government has informed the court that it intends to prove that

---

[6]  Although both counts also assert that Acevedo Vila understated his income on the Puerto Rican tax returns that he filed with his federal returns, the only reason that is apparent from the charges themselves as to why a false statement of income on the Puerto Rican returns could be material to the federal return is that it helps to conceal the understatement of total gross income on line 22 of his federal returns.

Acevedo Vila's federal returns are false because he failed to properly account for his Puerto Rican-sourced income when claiming his foreign tax credit, determining the allowance amount of his deductions, and calculating his alternative minimum tax liability.  Because this theory of culpability varies materially from the theory on which Counts 26 and 27 are based, Acevedo Vila could not be convicted of the charges based on the evidence that the government intends to offer at trial.  United States v. Cruz-Arroyo, 461 F.3d 69, 77 (1st Cir. 2006) (conviction barred when trial evidence varies materially and prejudicially from the charge returned by the grand jury).

Although a court ordinarily cannot dismiss a facially valid charge before trial based on a claim that the trial evidence will not support the charged offense, no point would be served in waiting until the government has presented its evidence to dismiss the false tax return charges because the government concedes that it will not even attempt to prove at trial that Acevedo Vila's entries on line 22 were false.  Accordingly, Counts 26 and 27 are dismissed without prejudice to the government's right to seek alternative charges that more closely conform to its anticipated evidence.

## IV.   <u>CONCLUSION</u>

For the reasons set forth in this Memorandum and Order, Counts 10–22 are dismissed with prejudice and Counts 26 and 27 are dismissed without prejudice.  Defendants' motions to dismiss (Doc. Nos. 169, 171, 172, 176, 177, 182, 188, 190, and 222) are otherwise denied.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge
District of New Hampshire
Sitting by Designation

December 1, 2008

cc:  Counsel of Record